# Illinois Official Reports

## Appellate Court

---

### *Gapinski v. Gujrati*, 2017 IL App (3d) 150502

---

| | |
|---|---|
| Appellate Court Caption | REBECCA GAPINSKI, Individually and as Duly Appointed Administrator of the Estate of Daniel W. Gapinski, Deceased, Plaintiff-Appellee, v. MEENA GUJRATI, M.D., and CENTRAL ILLINOIS PATHOLOGY, S.C., a Domestic Corporation, Defendant-Appellants. |
| District & No. | Third District<br>Docket No. 3-15-0502 |
| Filed | April 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 11-L-27; the Hon. Troy D. Holland, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kevin J. Vedrine, Christopher J. Solfa, and Robert L. Larsen, Jr., of Cunningham, Meyer & Vedrine, P.C., of Warrenville, for appellant Meena Gujrati.<br><br>Matthew B. Smith and Kathleen M. Carter, of Quinn Johnston Henderson Pretorius & Cerulo, of Peoria, for other appellant.<br><br>James A. McPhedran and Anthony C. Raccuglia, of Anthony C. Raccuglia & Associates, of Peru, for appellee. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Carter specially concurred, with opinion.

**OPINION**

¶ 1 Plaintiff Rebecca Gapinski, individually and as the administrator of the Estate of Daniel Gapinski, deceased, sought to recover for medical malpractice she alleged was committed by defendant Meena Gujrati, M.D., an employee of defendant Central Illinois Pathology, S.C. (CIP), and resulted in Daniel's death from renal cell cancer. The jury found in favor of Rebecca, and the trial court entered a judgment against Gujrati and CIP in the amount of $1,727,409.50, jointly and severally. Gujrati and CIP appealed. We affirm.

¶ 2                                    FACTS

¶ 3 Daniel Gapinski, the late husband of plaintiff Rebecca Gapinski, began experiencing headaches and vision problems in early 2007. He saw his primary care physician, who referred him for magnetic resonance imaging (MRI). The results of the MRI indicated an undetermined tumor in his brain's pituitary region. Giueseppe Lanzino, a neurosurgeon, performed a biopsy and removed as much as the tumor as possible. In March 2007, while an employee of defendant CIP, defendant Meena Gujrati, a neuropathologist, read the biopsy slides and determined the mass in Daniel's brain was a primary, benign lesion called a meningioma.

¶ 4 Following a period of limited radiation, Daniel returned to work. In late 2008, Daniel's symptoms returned, and in early 2009, he saw neurosurgeon Jeff Klopfenstein, who attempted to schedule surgery for late February. Daniel sought a second opinion from Lanzino, who had moved to the Mayo Clinic. Daniel saw Lanzino on January 28, 2009, and was referred to John Atkinson, another neurosurgeon at Mayo Clinic, who saw Daniel the following day. Daniel sought an additional consultation with Daniel Prevedello of the University of Pittsburgh Medical Center (UPMC), who performed two surgeries in early February 2009.

¶ 5 The tissues obtained from the UPMC surgeries were evaluated in the UPMC pathology department, and Daniel was diagnosed with metastatic renal cell carcinoma, which had spread to the pituitary gland in his brain. He opted to be treated at the University of Chicago Medical Center (UCMC), where Russell Szmulewitz, a medical oncologist, headed Daniel's treatment plan. Szmulewitz obtained Daniel's records from OSF St. Francis Medical Center, which included the original tissue evaluated by Gujrati. A UCMC pathologist examined the tissues and found the original tissues included malignant cells, which he diagnosed as renal cell cancer. Daniel continued treatment at UCMC until his death.

¶ 6 Daniel and Rebecca filed their complaint on February 4, 2011, naming Gujrati, CIP, OSF St. Francis Medical Center (OSF), and Illinois Neurological Institute (INI) as defendants and alleging negligence, apparent agency, and vicarious liability. On OSF's motion for summary judgment, OSF and INI were dismissed. Gujrati and CIP filed their affirmative defense, arguing Rebecca's complaint was time-barred by the statute of limitations. In May 2013, they filed a motion for summary judgment on the same grounds, which the trial court denied.

¶ 7        In February 2014, Gujrati, who was represented by the same law firm as CIP, sought leave to substitute a new law firm as counsel. Rebecca objected based on the timing of Gujrati's motion, which was filed close to the scheduled start of trial. Ultimately, Rebecca agreed to the change in counsel if the trial court required the defense attorneys to take turns or alternate questioning witnesses and allowed only one of them at a time to represent the defendants. The trial court granted Gujrati's motion to substitute and Rebecca's request to ban dual representation. It allowed Gujrati and CIP to each have its own counsel, file individual pleadings, and litigate the individual cases until trial but ordered that counsel for Gujrati and CIP be allowed to participate only one at a time during the trial.

¶ 8        Also in February, the trial court granted Rebecca's motion for partial summary judgment, finding that Gujrati and CIP were in an employee-employer relationship, that *respondeat superior* applied, and that CIP would be vicariously liable for Gujrati's malpractice.

¶ 9        In April 2014, CIP moved for a protective order, seeking to have Daniel's original biopsy tissue recut and evaluated by its consulting opinion witnesses. Over plaintiff's objection, the trial court granted CIP's motion and ordered that Gujrati and CIP be provided 10 cuts from the original tissue and that Rebecca also be provided 10 cuts. Per the court's order, the recuts were available to the parties for staining and evaluation. CIP was allowed additional time until May 1, 2014, to supplement its expert disclosures with opinions based on the recuts. Gujrati and CIP did not thereafter disclose any witnesses based on expert evaluation of the recuts.

¶ 10       On June 1, 2014, Rebecca filed her "rebuttal" disclosures regarding the recuts, including the opinion of her neuropathologist expert witness, Hannes Vogel, that the 2007 tissues "demonstrate[d] metastatic clear cell carcinoma of the kidney." CIP moved to bar Rebecca's rebuttal disclosures, and Rebecca sought to convert her rebuttal disclosures to supplemental disclosures. The trial court denied CIP's motion and granted Rebecca's motion.

¶ 11       Daniel died on May 31, 2014, due to a metastasis to his abdomen from the kidney. Rebecca filed a first amended complaint, adding survival, wrongful death, and loss of consortium claims. Gujrati and CIP each answered and asserted affirmative defenses based on the statute of limitations. Gujrati and CIP also filed motions to dismiss based on the expiration of the statute of repose, which the trial court denied.

¶ 12       The trial ensued, and the following evidence was presented. Daniel's primary care physician, Joel Leifheit, saw Daniel in March 2007. Daniel was complaining of headaches and vision problems. Leifheit ordered various tests, including an MRI, which revealed a mass in Daniel's brain. Leifheit referred Daniel to Giueseppe Lanzino, a neurosurgeon at OSF St. Francis Medical Center in Peoria. Lanzino performed surgery in March 2007, taking a biopsy of the mass and removing a limited portion of the tumor. Lanzino referred Daniel for radiation treatment. James McGee, a radiation oncologist, provided a course of radiation treatment.

¶ 13       After symptoms returned in September 2008, Daniel sought treatment with a new primary care physician, Ricardo Calderon, who referred Daniel to an endocrinologist and a neuro-ophthalmologist. An MRI in January 2009 showed the tumor had grown. In January 2009, Daniel also saw Lanzino and Atkinson, another neurosurgeon, at the Mayo Clinic. Daniel sought an additional opinion from Prevedello at UPMC. Prevedello performed two surgeries, and tissue he removed was tested. Based on the results of the tests, Daniel was diagnosed with metastatic renal cell carcinoma.

¶ 14       Rebecca testified to the chronology and details of Daniel's illness and treatment. When she and Daniel met with Lanzino and Atkinson at Mayo Clinic in late January 2009, they both

expressed concern that the tumor was not following the growth pattern of a classic meningioma. Atkinson was suspicious the tumor was not a benign meningioma and thought that it was behaving more like a malignancy.

¶ 15 Even after Atkinson expressed his concern that the tumor was behaving like a malignancy, Daniel continued to receive treatment based on the original diagnosis of a benign meningioma. Rebecca and Daniel received the diagnosis of metastatic renal cell carcinoma on February 12, 2009, from Prevedello at UPMC. Daniel's kidney was removed in 2012, and he suffered a perforated bowel in 2013.

¶ 16 Vogel testified as a neuropathologist expert for Rebecca. He reviewed the 2007 slide that Gujrati examined, the slides from UPMC, and the recut slides. He also performed additional testing on the recut tissue. It was his opinion, based on a reasonable degree of medical certainty, that Gujrati deviated from the standard of care of a reasonably competent, well-trained pathologist or neuropathologist in reading Daniel's biopsy samples as benign meningioma and not renal cell carcinoma. It was Vogel's further opinion that Gujrati deviated from the standard of care in the stains she used to evaluate the tissue samples and in failing to include cancer as part of a differential diagnosis. Vogel also opined that Gujrati's misdiagnosis was the proximate cause of the delay in Daniel's treatment for cancer and that a different course of treatment would have been prescribed had Daniel been properly diagnosed.

¶ 17 James Brown testified as an expert in urology with a specialty in neurological oncology. He explained that when cancer starts in the kidney, like Daniel's cancer, if the kidney is removed in an "opportune time," the patient is cured without any further opportunity for the cancer to spread. Brown explained the course of treatment for someone diagnosed with primary kidney cancer that had spread to the brain, including removal of the kidney. When Daniel's cancer was diagnosed as malignant in 2009, his kidney could not be removed because once he stopped taking certain medications used to treat his brain tumor, symptoms returned before the kidney surgery could take place. Brown explained the team approach to treatment. In his opinion, Daniel lost the opportunity for a cure and for the usual course of treatment because of the missed diagnosis.

¶ 18 On cross-examination, Brown stated that in his opinion, Daniel had stage 4 renal cell cancer in March 2007 and had a poor prognosis. Patients with stage 4 cancer had a five-year survival rate of 12 to 14% in 2007, with a median survival time of 12 to 14 months. If Daniel had been properly diagnosed in 2007, Brown would have told Daniel that his five-year survival rate was 10 to 15%, even with treatment. Because of Daniel's brain tumor, Daniel had a very limited chance to live beyond 10 years. During Brown's testimony, the defense objected on the grounds that his testimony was beyond the scope of his expertise and that his trial testimony was cumulative and duplicative of the other witnesses.

¶ 19 Defendant Meena Gujrati, the neuropathologist who analyzed the original biopsy tissues in 2007, testified. Her report regarding Daniel's tissue samples did not indicate he had cancer. Her final pathological diagnosis was a pituitary tumor, meningioma. Her diagnosis was based upon histologic examination and the clinical information she received from the surgeon Lanzino that the tissue looked like a meningioma. When she diagnosed Daniel in 2007, she was an employee of defendant CIP.

¶ 20 Prevedello, the neurosurgeon who operated on Daniel in February 2009, testified that he began treating and operated on Daniel for a meningioma based on the medical history. Because of bleeding from the tumor, he had to conduct two surgeries. He performed a biopsy, and his

analysis of the frozen section showed malignant characteristics, which he characterized as an aggressive meningioma. He was surprised when told by the UPMC pathologist that Daniel had renal cell cancer. He immediately told Daniel, which occurred on February 11. He also ordered an MRI, which showed a mass in Daniel's kidney.

¶ 21    Russell Szmulewitz, a medical oncologist, testified. He had a subspeciality in genitourinary oncology, including kidney cancer, and treated Daniel for the five-year period before his death. The majority of patients with renal cell cancer die, and treatment merely delays the death. He did not know whether Daniel would have had a significantly longer survival had he received treatment for cancer in 2007 instead of 2009. In 2013, the cancer metastasized to Daniel's abdomen. If he had been properly diagnosed, Daniel would not have suffered abdomen problems, later bleeding events, and seizures. In his opinion, with a proper diagnosis, Daniel could have been cancer free in 2007.

¶ 22    Susan Pannullo, a neurosurgeon and neurologist with a subspecialty in neuro-oncology, testified as a retained expert. She explained what the treatment plan for Daniel would have been in 2007 as compared to 2009, had he been properly diagnosed. As much of Daniel's tumor that could be removed was removed in 2007, and a correct diagnosis would not have changed that outcome. Similarly, the surgeries that occurred at UPMC removed as much of the tumor as possible without damaging Daniel's vision. It was unsafe to give Daniel additional radiation after the surgeries at UPMC because of the prior radiation he received. In her opinion, although "not within [her] subspecialty," Daniel's tumor had less chance of spreading to his abdomen had the proper treatment plan been provided for Daniel in 2007. The defense objected on the grounds that her testimony was beyond the scope of her expertise and that her trial testimony was cumulative and duplicative.

¶ 23    John Buatti testified as Rebecca's retained radiation oncology expert. He discussed the reasonableness of Daniel's treatment plan options. In his opinion, the two-year delay in diagnosis had a substantial impact. If Daniel had been properly diagnosed in 2007, he would have received more aggressive radiation to his brain tumor, within the limitations of the tumor's location. Buatti would have been able to radiate the tumor with low risk with aggressive treatment. Daniel could not receive a therapeutic dose of radiation in 2009 because of the misdiagnosis in 2007. On cross-examination, Buatti acknowledged that even with all appropriate treatments, the success rate for renal cell carcinoma with brain metastases was 10 to 20%, with a median survival length of 15 to 18 months for metastatic pituitary renal cell carcinoma. The average survival rate in 2007 for someone in Daniel's condition would have been 12 to 14 months. During Buatti's testimony, the defense objected on the grounds that his testimony was beyond the scope of his expertise and that his trial testimony was cumulative and duplicative.

¶ 24    Several family members testified that they accompanied Daniel to doctor appointments and treatment sessions and that at no time prior to the diagnosis at UPMC did any doctors indicate Daniel had cancer. Daniel's evidence deposition was played for the jury. When he finished radiation after his brain tumor was first removed, he thought he was cancer free. None of the doctors he saw said he had cancer until he was diagnosed after the surgeries at UPMC. At that time, he was told his brain tumor was cancerous and had started in the kidney. He lost his opportunity to live a life because of the misdiagnosis.

¶ 25    Geoffrey Murdoch, an anatomic pathologist with a specialty in neuropathology at UPMC, testified by evidence deposition. He analyzed the tissue samples and diagnosed metastatic

renal cell carcinoma. Atkinson testified by evidence deposition. He was a neurosurgeon and pituitary specialist. In his view, Daniel's tumor was not acting in a "benign" manner. Although he did not remember the conversation with Daniel and Rebecca, he would have shared his view with Daniel and described the tumor as "aggressive." In his opinion, the tumor was surgically incurable.

¶ 26    Rebecca rested, and Gujrati and CIP both moved for a directed verdict based on expiration of the statute of limitations. Rebecca moved for partial summary judgment, seeking a finding the case was timely filed. The trial court denied CIP's motion and granted Rebecca's motion.

¶ 27    The defense presented its case. Michael Naughton testified as a retained medical oncologist expert. In his opinion, Daniel had stage 4 renal cell carcinoma in 2007, and his tumor was incurable. Daniel's median survival rate in 2007 was two years, and he had approximately a 10% chance of a five-year survival. Because the tumor was located near important structures in the brain, it would not have been possible to remove the entire tumor in 2007. Daniel's long-term survival was not impacted by the two-year delay in diagnosis. In his opinion, earlier treatment would not have altered the outcome.

¶ 28    McGee, Daniel's treating radiation oncologist in 2007, testified that had he known the tumor was malignant and not benign, he would not have ordered more or different radiation. The tumor was touching areas of the brain that are very sensitive to damage from radiation, which limited the radiation treatment Daniel could receive.

¶ 29    Joseph Simpson testified as a radiation oncology expert. He opined that in 2007, Daniel's condition was incurable because it had metastasized to the brain and that it was no more curable in 2007 than in 2009. The radiation dosage Daniel received was appropriate, regardless of the diagnosis. Removal of Daniel's kidney would have helped his short-term survival but not his long-term chances.

¶ 30    Ty Abel testified as a retained neuropathology expert and as an expert on the standard of care applicable to Gujrati. The slides reviewed by Gujrati were consistent with a diagnosis of benign meningioma, and she used a reasonable choice of tests in reaching her diagnosis. Under the applicable standard of care, she was not required to do additional testing or seek a second opinion. In his opinion, her diagnosis complied with the standard of care of a reasonably careful neuropathologist.

¶ 31    Arieh Shalhav, a urological oncologist, testified. He began treating Daniel in 2009 when he evaluated Daniel for kidney removal surgery. Daniel's tumor was likely always aggressive, and stage 4 tumors are unlikely to be cured. The small size of the kidney tumor in 2009 when it had already metastasized was suggestive of a cancerous component.

¶ 32    Gujrati testified. She diagnosed Daniel with a benign meningioma after testing the biopsy samples. She explained how the slides indicated meningioma, not cancer. She performed hematoxylin and eosin (H&E) immunohistochemical staining and other special stains. Based on her initial diagnosis, she did not perform a CD10 stain, which would have been more specific to a renal cell carcinoma. In her view, she complied with the standard of care in reading the slides and making the diagnosis. The standard of care did not require her to obtain a consultation. She agreed that Daniel had renal cell carcinoma in 2007.

¶ 33    The jury returned a verdict in favor of Rebecca in the amount of $1,727,409.50, and the trial court entered a judgment order against Gujrati and CIP. They filed motions for judgments notwithstanding the verdict and for a new trial. They also moved to reduce the judgment. The

motions were heard and denied. Gujrati and CIP timely appealed.

¶ 34                                    ANALYSIS

¶ 35        There are six issues on appeal: whether the trial court erred when it barred Gujrati and CIP from dual representation, allowed supplemental disclosure of the opinion of Gapinski's expert witness and the testimony of several of Rebecca's expert witnesses, found the complaint was not barred by the statute of limitations, and denied Gujrati and CIP's motions for a new trial based on the conduct of Rebecca's attorney, and whether the jury verdict was against the manifest weight of the evidence.

¶ 36        The first issue is whether Gujrati and CIP were denied a fair trial where the trial court barred them from dual representation. The defense argues that by barring the attorneys for both defendants from both actively participating in the trial, the trial court allowed the counsel for each defendant to only represent its client's interests half the time and expected both defense attorneys to represent the other defendant, a non-client.

¶ 37        The trial court has the authority to control the questioning of witnesses and the presentation of evidence. Ill. R. Evid. 611(a) (eff. Jan. 1, 2011). A trial judge has inherent authority to control his courtroom. *Mason v. Snyder*, 332 Ill. App. 3d 834, 842 (2002). Each defendant in a multidefendant case is entitled to present an expert in its defense. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 36. We review a trial court's rulings regarding the admissibility of witness testimony for an abuse of discretion. *Taylor*, 2011 IL App (1st) 093085, ¶ 23.

¶ 38        We find the trial court's ruling to bar dual representation was not in error. When Gujrati moved to substitute counsel in February 2014, the trial was scheduled to begin June 16. Rebecca objected on the basis of the timeliness of the motion and the potential adverse consequences substitution of counsel would have on the trial date. At this point, the case had been pending for three years. Arguably, the trial court would have been within its discretion to deny Gujrati's motion to substitute outright. Instead, it exercised discretion by offering a compromise to the parties. Rebecca agreed to Gujrati's substitution of counsel if Gujrati and CIP were barred from both participating in the trial at the same time.

¶ 39        The trial court considered that allowing both Gujrati and CIP to present opening and closing statements and question witnesses would be redundant and unnecessary and would prejudice Rebecca. The trial court noted that the liability at issue was vicarious as to CIP, and if Gujrati was found liable, CIP was also liable, and conversely, if Gujrati was not liable, CIP would not be liable. They shared a commonality of interests. Until shortly before trial, the defendants were represented by the same law firm. After Gujrati was allowed new counsel, the defendants filed independent pleadings until the trial started. At trial, each defendant was allowed to present its own expert witnesses and to question them. They were barred only from both participating at the same time and were not denied a fair trial.

¶ 40        The next issue is whether the trial court erred by allowing supplemental disclosure of the opinion of Vogel, Rebecca's expert witness. Gujrati and CIP argue that the disclosure of Vogel's opinions regarding the recuts was untimely and that Vogel was allowed to present impermissible rebuttal testimony.

¶ 41        Rule 213 mandates that parties supply and identify the subject matter of their witnesses; the witnesses' conclusions, opinions, and their bases; the witnesses' qualifications; and any reports prepared by the witnesses. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). The opinions of an

expert are limited to what was disclosed per Rule 213 or in a discovery deposition. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). When new or additional information becomes available, parties have a duty to "seasonably supplement or amend" the prior disclosure. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007). Supplemental disclosure is required as soon as the additional information is known. *Lucht v. Stage 2, Inc.*, 239 Ill. App. 3d 679, 692 (1992). " '[A] witness may elaborate on a previously disclosed opinion' as long as the testimony is encompassed by the original opinion and is not a new reason" for it. *Kovera v. Envirite of Illinois, Inc.*, 2015 IL App (1st) 133049, ¶ 63 (quoting *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 849 (2010)). The purposes of Rule 213 are to avoid surprise and discourage tactical gamesmanship. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10 (2004). We will not reverse a trial court's decision whether to admit expert opinion per Rule 213 unless it was an abuse of discretion. *Sullivan*, 209 Ill. 2d at 109.

¶ 42    The trial court considered that the defense opened the door by asking for the recuts and that Rebecca's late disclosure of Vogel's opinion was contemplated in the order granting the defense motion. Rebecca was required to "seasonably supplement" Vogel's disclosures after he evaluated the recuts, which she timely did. There was no surprise or prejudice to the defendants. Vogel's original opinion disclosed that the 2007 tissues showed renal cell cancer, and his supplemental disclosure stated the same opinion. We find the trial court did not abuse its discretion in allowing Rebecca's disclosure of Vogel's opinion based on the recuts.

¶ 43    The third issue is whether the trial court erred in allowing the testimony of several of Rebecca's expert witnesses, which Gujrati and CIP challenge as duplicative and beyond the scope of their areas of expertise. They also a claim proper foundation was not established for the testimony and it should not have been admitted.

¶ 44    To establish a foundation for an expert's testimony, the proponent must establish that the witness is a licensed member of the school of medicine about which he will offer an opinion and that the witness is familiar with the methods, procedures, and treatments that other doctors in his or similar communities observe. *Purtill v. Hess*, 111 Ill. 2d 229, 242-43 (1986). When the foundational elements are established, the trial court then considers whether the expert is competent to testify in the case before it. *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 5 (2007). An expert's actual experience in practice may provide the necessary knowledge of the applicable standards of care and allow him to opine about whether the defendant deviated from the standard of care. *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 154 (1997).

¶ 45    The trial court has discretion over the cross-examination of witnesses and may "permit inquiry into additional matters as if on direct examination." Ill. R. Evid. 611(b) (eff. Jan. 1, 2011). Cross-examination allows the questioning party to probe bias, partisanship, or financial interest and is a principal safeguard against errant expert testimony. *Trower v. Jones*, 121 Ill. 2d 211, 217 (1988). The trial court's admission of evidence, including expert testimony, will not be overturned absent an abuse of discretion. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010).

¶ 46    Gujrati and CIP complain that Rebecca's expert witnesses, Brown, Pannullo, and Buatti, offered duplicative testimony and were permitted to testify beyond their areas of expertise. We disagree. The experts established their qualifications and testified based on their knowledge and understanding of cancer and its treatment. They explained they worked in multidisciplinary teams with other tumor or cancer specialists and were familiar with the procedures and treatments. We find the experts' testimonies were properly admitted and were not beyond their areas of expertise.

¶ 47    The defendants further argue that Vogel improperly testified as to what he would have done in testing the slides instead of what the standard of care required. This argument is not supported by the record. Vogel testified that in his opinion, to a reasonable degree of medical certainty, Gujrati's analysis of the slide was a deviation from the standard of care. He then discussed what he would have done in compliance with the standard. He did not use his personal practice to establish the standard of care.

¶ 48    The defendants argue that the trial court allowed Rebecca's witnesses to provide volunteer statements during cross-examination, rather than answering with a "yes" or "no." The cross examination of the expert witnesses was properly allowed by the trial court. The witnesses either answered "yes" or "no" or with a statement that explained why a "yes" or "no" answer was inappropriate. We find Gujrati and CIP were not denied a fair trial by the court's evidentiary rulings regarding expert witness testimony.

¶ 49    The fourth issue is whether the trial court erred when it denied Gujrati and CIP's motion for summary judgment and for a directed verdict on limitation grounds. They argue the evidence overwhelmingly established that Rebecca had knowledge of Daniel's injury and that Gujrati caused the injury more than two years before she filed her complaint, making her complaint untimely.

¶ 50    The statute of limitations for medical malpractice claims is two years from "the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the existence of the injury or death for which damages are sought." 735 ILCS 5/13-212(a) (West 2012). Time begins to run under section 212(a) when the plaintiff reasonably discovers the defendant's negligence might have contributed to the injury, not when the plaintiff knows of the injury. *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 15. The time when a plaintiff knew or should have known of the injury and that it was wrongfully caused are generally a question of fact but can be determined as a matter of law where the facts are undisputed and only one conclusion may be drawn from them. *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004). The trial court's denial of motions for summary judgment and for a directed verdict are reviewed *de novo*. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42; *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 28 (2008).

¶ 51    Rebecca used reasonable efforts to determine whether Daniel had an injury and whether it was wrongfully caused. After the initial benign diagnosis in 2007 and subsequent treatment, Daniel was warned to watch for the recurrence of his symptoms. When his symptoms returned in September 2008, Daniel saw his primary care doctor, and in January 2009, Daniel met with a neurosurgeon. Daniel next saw Lanzino and Atkinson in late January 2009, and both doctors observed the tumor was not acting like a benign tumor. Rebecca testified that she began to suspect cancer after the meeting with Lanzino and Atkinson. However, both Lanzino and Atkinson consulted with Daniel for a meningioma, and neither informed them that Daniel had cancer. When Daniel saw Prevedello at UPMC in early February, he, too, treated Daniel as if he had a meningioma. Prevedello was surprised when he was informed by the pathologist that the tissues he removed during the surgery were malignant. He immediately informed Daniel and Rebecca that he had renal cancer on either February 11 or 12, 2009.

¶ 52    We find the complaint was timely filed on February 4, 2011. Up until the results from the tissues removed during the UPMC surgeries were delivered to Prevedello, Daniel was treated for a benign tumor. When his symptoms returned in 2008, he immediately sought medical advice and did so again when the symptoms continued in 2009. Throughout the term of his

illness, Daniel used reasonable diligence in securing treatment. He was not aware until February 11 or 12, 2009, that the tumor was cancerous. Once he discovered that he was injured and that his injury was wrongfully caused, he and Rebecca filed their complaint within two years. The trial court did not err in denying Gujrati and CIP's motions for summary judgment and a directed verdict.

¶ 53    The fifth issue is whether the trial court erred in denying Gujrati and CIP's motion for a new trial based on the conduct of Gapinski's counsel. Gujrati and CIP accuse plaintiff's counsel of running "roughshod" over the trial court and their rights. They also complain of counsel's objections during trial, improper questioning on cross-examination, and violation of the trial court's *in limine* rulings.

¶ 54    Attorney misconduct and improper argument may be the basis for a new trial. *Grillo v. Yeager Construction*, 387 Ill. App. 3d 577, 600-01 (2008) (citing *First National Bank of La Grange v. Glen Oaks Hospital & Medical Center*, 357 Ill. App. 3d 828, 833 (2005)). To support the grant of a new trial, the improper conduct must substantially prejudice the party. *Grillo*, 387 Ill. App. 3d at 601. When a trial court sustains an objection and gives the jury a limiting instruction, any prejudice from the improper comment is cured. *Grillo*, 387 Ill. App. 3d at 601. We review a trial court's denial of a motion for a new trial for an abuse of discretion. *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 21.

¶ 55    Gujrati and CIP offer a number of instances in which they maintain plaintiff's counsel acted egregiously, interjected improper commentary, violated motions *in limine* and the dual representation bar, and substituted different criteria instead of using the standard of care. The evidence does not support their claims. We did not discover any examples of egregious behavior by plaintiff's counsel that would justify a new trial. In other instances of which the defendants complain, the trial court properly sustained the defense objections or overruled Rebecca's objections. The court struck Rebecca's question in violation of the motion *in limine* and barred counsel from moving forward on that line of questioning. Comments by plaintiff's co-counsel were directed toward trial logistics and did not violate the dual representation bar. We find there was no impropriety in the conduct of plaintiff's counsel such that the defense was substantially prejudiced and no error by the trial court in denying the defendants' motion for a new trial.

¶ 56    The final issue is whether the jury verdict was against the manifest weight of the evidence. Gujrati and CIP argue that Rebecca failed to establish that Gujrati's misdiagnosis was the proximate cause of Daniel's injury and death and that the jury's verdict was not supported by the evidence.

¶ 57    To sustain a cause of action for medical malpractice, a plaintiff must allege and prove (1) the proper standard of care applicable to measure the medical professional's conduct, (2) a deviation from the standard, and (3) an injury that was proximately caused by the deviation. *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 863-64 (2008). In medical malpractice cases, expert testimony is generally needed to establish the standard of care and its breach. *Willaby*, 383 Ill. App. 3d at 864 (citing *Snelson v. Kamm*, 204 Ill. 2d 1, 43-44 (2003)). This court reverses a jury verdict only when it was against the manifest weight of the evidence. *Snelson*, 204 Ill. 2d at 35.

¶ 58    The defense argues that its witnesses were more credible and believable than the experts for Rebecca and that the testimony of their experts defeated the theory of the case supported by Rebecca's experts. The jury was responsible for determining issues of witness credibility. Both

sides presented evidence in favor of their theory of the case. The jury chose Rebecca's theory over Gujrati and CIP's theory and found the testimony of Rebecca's experts more compelling than the testimony of the defense experts. Rebecca's witnesses established the standard of care and that Gujrati deviated from it and caused injury. We find the jury's verdict was not against the manifest weight of the evidence.

¶ 59    For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

¶ 60    Affirmed.

¶ 61    JUSTICE CARTER, specially concurring.

¶ 62    I join the majority opinion without reservations. However, I write separately in order to present an additional rationale in support of the holding, finding that the defendants were not denied a fair trial when the trial court limited the defendants' attorneys to participating only one at a time during the trial. It is not uncommon for judges in some cases encompassing claims or defenses held by multiple parties, such as class actions, derivative lawsuits, mass tort actions, or other representative actions, to place some controls over the litigation, including empowering one attorney to conduct part of the trial. See Principles of the Law: Aggregate Litigation § 1.05 cmts. b, c (Am. Law Inst. 2009). Likewise, it would not be unusual, in a situation where the parties' litigation interests are nominally the same, for the judge to place some reasonable limitations on the parties regarding trial participation, subject to due process concerns. The decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial are generally reviewed for an abuse of discretion. See *In re D.T.*, 212 Ill. 2d 347, 356 (2004).

¶ 63    The due process clause of both the Illinois and United States Constitutions requires, at a minimum, that litigants have a full and fair opportunity to litigate an issue before they are bound by that issue's resolution. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.*, 158 Ill. 2d 218, 225-26 (1994) (insurers were deprived of procedural due process when they were barred from participating at trial and also denied a severance). A fundamental requirement of due process is that a party be afforded the opportunity to be heard at a meaningful time and in a meaningful manner, with the operative term being " 'meaningful.' " *In re D.W.*, 214 Ill. 2d 289, 316 (2005); see *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). " 'Due process is flexible and calls for such procedural protections as the particular situation demands' " related to time, place, and circumstances. *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). However, meaningful participation does not mean that parties with a common interest have a right to overlap their questions and arguments. That is, a principle complimentary to due process is the rule that trial court judges may manage a trial in order to promote efficiency within the limits of due process. See Ill. R. Evid. 611(a) (eff. Jan. 1, 2011).

¶ 64    Illinois Rule of Evidence 611 sets out the basic principle that the trial court has the authority to control all aspects of a trial, including the order of presentation of evidence and the manner in which the proceedings will be conducted in general. See Ill. R. Evid. 611(a) (eff. Jan. 1, 2011). In addition, under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), evidence can be excluded based on consideration of undue delay, waste of time, or needless presentation of cumulative evidence. As to examination of witnesses, Professor Wigmore indicated that it had

long been a tradition that but one attorney should question during a single stage in the examination of a single witness. 3 John H. Wigmore, Evidence § 783 (Chadbourn rev. ed. 1970). Professor Wigmore pointed out that the rule had been recognized in both judicial proceedings generally and in a few statutes. Wigmore, *supra*. It thus appears that there is no rule prohibiting judges, at their discretion, from allowing examination of witnesses and presentation of arguments to be split or divided between the attorneys for parties with identical interests.

¶ 65    That same authority existed in the English common-law tradition as found in Campbell's[1] Report of Cases determined at Nisi Prius. Where separate attorneys appeared for several defendants with the same interest, only one counsel could be heard when addressing the jury or when conducting examination of the witnesses. *Chippendale v. Masson* (1815) 171 Eng. Rep. 56; 4 Camp. 174; *cf. Doe v. Roe* (1809) 170 Eng. Rep. 1155; 2 Camp. 280 (generally the examination of a witness should be carried out by only one counsel when a party is represented by several attorneys, but there can be exception to that rule if justice requires). In *Chippendale*, Chief Justice Gibbs[2] stated:

> "[T]he interest of the defendants being the same, I can only hear one counsel. This is a rule I received from a judge of whom no one can speak without respect and almost reverence; I mean my very learned and excellent predecessor, Chief Justice Mansfield.[3] By this rule I will abide. It cannot be left in the power of a number of defendants whose interests are precisely the same, by separating in their defences, to make 20 causes out of one. I consider it a remote possibility that such an attempt should be made; but rules of practice must be framed with a view to enforce the regular and decorous conduct of judicial business. I therefore consider it as established, that where several defendants in the same interest defend separately, the counsel who happens to be senior, and he alone, can address the jury. The witnesses are to be examined by counsel successively, in the same manner as if the defence were joint and not separate." *Chippendale*, 171 Eng. Rep. at 56-57; 4 Camp. at 174-75.

¶ 66    In the instant case, the trial judge had the same concerns as those found in the old English case. The trial court was concerned with protecting witnesses from unduly confusing and excessive cross-examination and repetitive arguments. At the posttrial motion hearing, the trial court explained its reasoning as to the dual representation procedure:

> "To have both Defendants present an opening statement, closing statement and question the witnesses I think would have been redundant and unnecessary given the facts and circumstances that we have here. The trial took nearly a month as we conducted it. I think it was well within this court's discretion to limit the Defendants in the manner that it did to prevent repetition and to assure the trial proceeded in a timely manner.

---

[1]John Campbell, 1st Baron Campbell, PC, QC (September 17, 1779 to June 24, 1861) Chief Justice, Queen's Bench (March 5, 1850 to June 24, 1859).

[2]Sir Vicary Gibbs, PC, KC (October 27, 1751 to 1820) Chief Justice of the Common Pleas (1814 to 1818).

[3]Sir James Mansfield, SL, KC (1733 to November 23, 1821) Chief Justice of the Common Pleas (1799 to 1814).

This is not a circumstance where liability of each Defendant was based on some kind of different facts at different times or some kind of factual differences. It was liability, it was just that, it was vicarious liability. If Dr. Gujrati was found liable, Central Illinois Pathology was also going to be found liable. I think to allow multiple closing arguments, to allow multiple opening statements, and to allow multiple questioning would have prejudiced the Plaintiff in this case and would have been an inefficient use of trial time."

¶ 67 Earlier, before the trial, the trial judge articulated his reasoning as follows:

"I think it comes down to a trial management issue as to questioning of witnesses, and Mr. Vedrine's point it's something the court is going to have to deal with at trial if an issue comes up where that witness has been asked the question by one counsel and the other counsel is going to try to ask the same question, the court is going to have to deal with this. This court wants an efficient trial. I don't want to keep dealing with questions, nuances of questions. I want it to run efficiently."

¶ 68 Given a court's power to control the conduct of trial procedure, the trial judge can, at his discretion, split examination of witnesses and divide the opening statements and closing arguments between counsel for separately represented defendants with identical interests. In this particular case, the trial judge reasoned that to allow multiple arguments and questions would have been redundant and unnecessary given the nature of the case, since if Dr. Gujrati was found liable, then Central Illinois Pathology would also be found liable based on principles of vicarious liability. The defendants had a commonality of interest in the defense.

¶ 69 Defendants in the instant case have failed to point to any evidence or argument that they were prevented from introducing at the trial. The defendants simply do not show they were prejudiced in any manner. Nothing in the procedures that were followed resulted in unfairness to any party, violated fundamental due process, or constituted an abuse of discretion. Both defendants, through their attorneys, were afforded the opportunity to be heard at a meaningful time and in a meaningful manner during this trial.

¶ 70 Thus, for the reasons stated above, I respectfully specially concur with the majority opinion.