2022 IL App (1st) 200787-U

SECOND DIVISION
September 27, 2022

No. 1-20-0787

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| RACHEL LIPMAN, | ) | |
| | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | 16 L 431 |
| THOMAS WIEDRICH, M.D. and NORTHWESTERN | ) | |
| MEDICAL FACULTY FOUNDATION, an Illinois | ) | Honorable |
| Corporation, | ) | Thomas V. Lyons, II, |
| | ) | Judge Presiding |
|     Defendants-Appellees. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court did not err in denying motions for JNOV or new trial. Verdict was supported by evidence. Court's refusal to allow defendant to publish exhibit to jury in closing argument, even if error, would not have impacted outcome of trial, as plaintiff was allowed extensive cross-examination on issue and argued position in closing arguments.

¶ 2    Plaintiff Rachel Lipman developed a rare form of cancer that, unfortunately, metastasized to her lungs. She filed suit against Dr. Thomas Wiedrich and the Northwestern Medical Faculty Foundation, claiming that Dr. Wiedrich failed to properly recognize that a mass in her forearm could develop into this cancer. A jury returned a general verdict in favor of defendants.

¶ 3    She now appeals the court's denial of her post-trial motions for judgment notwithstanding the verdict (JNOV) and for a new trial. She argues that JNOV was appropriate because of the "overwhelming" and "uncontradicted" evidence that Dr. Wiedrich's failure to appreciate the risk of cancer was malpractice. She also claims the court erred by refusing to allow her to publish a "MyChart" entry describing her condition as "benign" to the jury. We find no error and affirm.

¶ 4                                    BACKGROUND

¶ 5    In the Fall of 2013, Rachel noticed a small lump on her right arm, near the elbow. She went to a family doctor who believed it was nothing serious and told her to come back if it got worse. Within a few months, it began to cause serious pain in her arm and fingers. That family doctor then referred her to Dr. Wiedrich, a board-certified plastic surgeon specializing in the lower arms and hands.

¶ 6    On December 19, 2013, Rachel had her first appointment with Dr. Wiedrich. During that visit, he took a comprehensive exam and ordered a same-day X-ray. The X-ray revealed nothing, and he ordered an MRI, which was performed within a month.

¶ 7    The MRI report showed that Rachel had three neurofibromas—"a tumor that arises in a nerve"—in her forearm. The most significant of the tumors likely qualified as a plexiform neurofibroma—a complex neurofibroma—which measured 3.2 centimeters. According to the radiologist's report, these multiple neurofibromas were suggestive of neurofibromatosis—a rare genetic condition that causes susceptibility to these nerve tumors. The report made no mention of malignancy. As experts at trial explained, neurofibromas are, by definition, benign. If they become malignant, they are reclassified as a malignant peripheral nerve sheath tumor. Because Rachel was suggestive for neurofibromatosis, the radiologist recommended a genetic consult.

¶ 8    Dr. Wiedrich testified that, after reviewing the MRI report, he knew he was not going to treat Rachel. He testified that he was unfamiliar with her conditions and did not possess the necessary knowledge to properly treat her. He looked for a doctor to whom he could refer her, using the search terms "geneticist" and "neurofibroma." That search led to Dr. Joel Charrow, who had experience treating the condition from which Rachel suffered. At the time Dr. Wiedrich found Dr. Charrow, he was not aware that Charrow was a pediatrician and only treated children.

¶ 9    On January 15, 2014, Rachel had her second (and last) appointment with Dr. Wiedrich. Like the first appointment, Rachel was accompanied by her mom, Joan Brogdon. At trial, the two sides had very different memories of this appointment. According to Rachel and her mother, the first thing Dr. Wiedrich told them was that she did not have cancer. This statement "shocked" them, as they had not even considered cancer as a possibility. He then told them that the mass could not be removed. Rachel did not remember him telling her it was a neurofibroma or that the radiologist suggested it was neurofibromatosis. The pair then asked Dr. Wiedrich about the pain. According to them, Dr. Wiedrich then recommended them to Dr. Charrow for pain management. Joan was adamant that it was her understanding that Dr. Charrow was for pain treatment only.

¶ 10   Dr. Wiedrich testified that he did not discuss cancer. In fact, he acknowledged at trial he did not appreciate, at the time, that neurofibromas could become malignant. Dr. Wiedrich stated that he went over the MRI report and told them that he did not treat neurofibromas or neurofibromatosis. He testified that he told them he could not remove the tumor without destroying her nerve function.

¶ 11   At trial, there was a disagreement about whether Dr. Wiedrich "recommended" or "referred" Rachel to Dr. Charrow. In Dr. Wiedrich's view, the two were synonymous in this situation; his post-appointment notes were that he "recommended" Charrow.

¶ 12    What the two agree on is that Dr. Wiedrich gave Joan a piece of paper with Dr. Charrow's contact information. It is likewise uncontested that neither Rachel nor Joan ever attempted to contact Dr. Charrow. Because they claimed Dr. Wiedrich did not impress on them the seriousness of the condition, Rachel first tried medical alternatives. She began by going to a hypnotist for the pain. This quickly failed and within a month, Joan reached out to her friend, a nutritionist, Deborah Arneson. While Joan and Rachel testified that cancer was not on their mind, Arneson specifically testified that Joan was concerned it may be cancer. Nevertheless, over the next year, Arneson treated Rachel using various dietary and alternative treatments to reduce the inflammation in Rachel's arm. Within the first few months of this treatment, Rachel's symptoms improved. Her pain went from excruciating to almost non-existent. At the same time, the lump reduced in size and softened.

¶ 13    Unfortunately, this improvement would only last a couple months. Starting in August 2014, the lump began to grow rapidly, and the pain returned. When Rachel came home from college for Christmas, her improvement had completely reversed; the lump had grown significantly, and the serious pain had returned.

¶ 14    During the first part of 2015, Joan tried to find help for Rachel's condition. Because they were still under the impression that cancer was not a concern, they focused their search on finding help removing the growth. Eventually, in March 2015, Rachel saw Dr. Mohuiddin, a radiation oncologist, after the lump continued to grow. After reviewing Dr. Wiedrich's notes, Dr. Mohuiddin was concerned that Rachel had neurofibromatosis. According to Rachel and Joan, it was Dr. Mohuiddin who first discussed the possibility that Rachel's tumor could be cancer. Dr. Mohuiddin then referred them to a surgical oncologist, Dr. Peabody.

4

¶ 15 By April, Dr. Peabody had performed a biopsy and diagnosed Rachel with cancer, specifically a malignant peripheral nerve sheath tumor. At this point, the tumor had become quite large. Given its size, Dr. Peabody recommended immediate amputation. However, he discussed some treatments that might reduce the tumor to a point they could consider removal of the tumor. Rachel had serious reservations about amputation. So over the next few months, Rachel tried the first of these treatments. It was not successful. By October, Rachel had decided to amputate. However, as the operation date approached, she reversed course and decided to try one final treatment option in the Netherlands—a treatment that is illegal in the United States.

¶ 16 In January 2016, around the same time as the treatment in the Netherlands, Rachel filed the present medical malpractice complaint against Dr. Wiedrich.

¶ 17 By May 2016, this last-ditch treatment reduced the tumor to the point that another doctor from New York, Dr. Singer, was confident he could safely remove the tumor. Dr. Singer did so in August 2016. While Dr. Singer removed the tumor, Rachel was not out of the woods. As one of plaintiff's experts, Dr. Sondak, opined, the type of cancer Rachel has can metastasize very early. In his opinion, there is a 5-centimeter breakpoint for metastatic disease. Generally speaking, if a patient receives treatment before a malignant peripheral nerve sheath tumor reaches 5 centimeters, there is a "good chance" they will avoid metastatic disease. "Above that size, the likelihood, even if local control is achieved, that we will see further appearance of cancer is much higher." As mentioned above, at the time Rachel saw Dr. Wiedrich, her tumor measured 3.2 centimeters—below the breakpoint. But at its largest, the tumor had grown to nearly 9 centimeters. As Dr. Sondak opined, this significantly increased Rachel's risk for metastatic disease. Dr. Sondak also explained that when malignant peripheral nerve sheath tumors metastasize, they usually spread to the lungs.

¶ 18    After the cancer was removed from her arm, Rachel was required to receive scans at regular intervals. At first, the scans did not show that the cancer had spread. Unfortunately, in November 2018, as her case was heading toward trial, one of the scans showed "a nodular near [her] lung and ribs that they had been following for a while, but it finally grew a little bit." The doctors performed a biopsy of this spot and confirmed that the cancer from her arm had metastasized before it was removed. She had this tumor removed. As of trial, in July 2019, she was cancer-free. However, because the cancer was already in her lungs, there is a significant chance it will return.

¶ 19    As noted, in addition to the parties' testimony, each side presented expert testimony of various doctors at trial.

¶ 20    Rachel's expert, Dr. Ogilvie, acknowledged that Dr. Wiedrich met the standard of care during the December 19 visit because he ordered the appropriate tests—an X-ray and MRI. However, he opined that Dr. Wiedrich failed to meet the standard of care during the January follow-up. First, Dr. Wiedrich was negligent for failing to understand that neurofibromas had a risk to become cancerous. This, in his view, should have been basic knowledge for any doctor who holds themselves out as a "lumps and bumps" expert. Next, while acknowledging that Dr. Wiedrich's recommendation to a geneticist was a good place to send Rachel, there was no indication that he discussed the possibility of cancer. Since Rachel's lump was suspicious, Dr. Ogilvie opined that Dr. Wiedrich was negligent for not scheduling a biopsy following the MRI results. As to the recommendation to Dr. Charrow, Dr. Ogilvie chastised Dr. Wiedrich for referring Rachel without clear instructions on how to follow up or what to do next.

¶ 21    In addition to his testimony described above, Dr. Sondak testified that a biopsy of Rachel's growth, in 2014, would have revealed that it was cancerous.

¶ 22    Dr. Wiedrich's experts, Drs. Reavy and Winfree, testified that Dr. Wiedrich complied with the standard of care. They did not believe that Dr. Wiedrich's failure to appreciate that neurofibromas could become malignant was a deviation from the standard of care because it was not within his training. As a plastic surgeon, Dr. Wiedrich did not have exposure to surgical oncology cases—particularly the type of this very rare genetic condition. Because Wiedrich recognized that Rachel's case was not in his area of expertise, the only appropriate course of action was to refer Rachel to another physician, as he did.

¶ 23    Dr. Reavy also specifically testified that it was appropriate for Dr. Wiedrich to rely on the radiologist's report during his follow-up with Rachel. According to Dr. Reavy, radiologists often try to cover their bases. If they suspect malignancy, their report will make some mention of it. In this case, the MRI report was completely silent on malignancy. As Dr. Reavy put it, "[h]e was going off an MRI report, which just mentions neurofibromatosis with no other comments. And based on his knowledge, there was no reason to consider cancer."

¶ 24    At trial, a major point of contention was what Dr. Wiedrich said, if anything, about Rachel's condition being cancer. Again, Rachel and her mother insisted that Dr. Wiedrich specifically told them that the tumor was not cancerous. Dr. Wiedrich, on the other hand, claimed that he never mentioned cancer one way or the other.

¶ 25    During Dr. Wiedrich's cross-examination, Rachel's counsel began to discuss a "MyChart" entry. MyChart is a patient portal that allows a patient to view medical records. These entries are not necessarily created by the doctor but take information from various sources—including the doctor's notes. Rachel's MyChart entry for the January follow-up visit indicated that she had been diagnosed with a "[b]enign tumor of connective and soft tissue. Added 1/15/2014."

7

¶ 26    Over the course of two sidebars, the circuit court ruled that Rachel's counsel could cross-examine Dr. Wiedrich using the MyChart print-out, because it supported Rachel's claim that he told her the tumor was not cancerous. Using that MyChart entry, Rachel's counsel obtained an admission from Dr. Wiedrich that Rachel's MyChart entry specifically stated that her tumor was benign. Counsel also used the content of Rachel's MyChart entry to argue in closing and rebuttal argument that it proved Rachel's side of the story—that Dr. Wiedrich specifically told her the tumor was *not* cancerous. The trial court did not allow plaintiff to publish a print-out of the MyChart entry to the jury during closing arguments.

¶ 27    The jury returned a general verdict in defendants' favor. Rachel filed a post-trial motion for judgment notwithstanding the verdict (JNOV), arguing that the jury's verdict was not supported by the evidence. She also sought a new trial, claiming the court erred by refusing to allow her to publish the MyChart entry to the jury. The court rejected both arguments. As to the MyChart entry, the court reasoned that:

> "the plaintiff was entitled to confront the doctor with the entry in the MyChart, although the doctor said he did not make that entry. And we had both Ms. Lipman as well as her mother saying that the doctor said it was not cancerous. The doctor said he never mentioned cancer. And, in fact, at some point he had testified that cancer was not even on his radar screen.
>
> Nevertheless, the plaintiffs were permitted to confront the doctor with this entry. We had—This was over defendants' strenuous objection. We had a sidebar, and we discussed the issues. And I made a ruling that the defendants—that the plaintiff would be—As I indicated earlier, and I think [counsel] agrees, the plaintiff never attempted to introduce this entry, either orally or visually, and publish it to the jury in their case in

8

chief, or as substantive evidence in their case in chief. It was only in confronting the doctor with it for impeachment purposes, and that was permitted. And I permitted both sides to argue reasonable inferences from the evidence, both any inferences or the significance of that, which the plaintiffs took full advantage and appropriately argued and hammered home that the entry in MyChart, although the physician had indicated he did not enter it, was consistent with the claims made by Ms. Lipman as well as her mother, plaintiff and her mother."

¶ 28    Rachel timely filed this appeal from the court's denial of her post-trial motion.

¶ 29                                    ANALYSIS

¶ 30    Before this court, Rachel argues that the court should have granted JNOV because the evidence does not support a defense verdict or, alternatively, she is entitled to a new trial because the court prevented her from publishing the MyChart entry. We address each point in turn.

¶ 31                        I. Denial of Motion for JNOV

¶ 32    To prevail on her claim for medical malpractice, Rachel had to prove (1) the proper standard of care applicable to the medical professional's conduct, (2) a deviation from that standard, and (3) an injury that was proximately caused by that deviation. *Gapinski v. Gujrati*, 2017 IL App (3d) 150502, ¶ 57. The jury returned a general verdict in defendants' favor, finding that Rachel failed to carry her burden on one or more of these elements. Rachel claims the court should have entered a JNOV in her favor and asks us to overturn the trial court's denial of her motion. We review the denial of JNOV *de novo*, meaning we perform the same function as the trial court. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

¶ 33    To succeed, Rachel must convince us that " 'all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based

on that evidence could ever stand.' " *Walton v. Dirkes*, 388 Ill. App. 3d 58, 60 (2009) (quoting *Townsend v. University of Chicago Hospitals,* 318 Ill. App. 3d 406, 408 (2001)). That high burden reflects the deference we give to the jury; we may not overturn the verdict simply because we might have a reached a different conclusion than the jury. *McClure*, 188 Ill. 2d at 132; *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992)). If the evidence, along with reasonable inferences to be drawn from it, could be fairly interpreted to support the jury's verdict, a JNOV is improper. *McClure*, 188 Ill. 2d at 132.

¶ 34     Rachel argues that defendants' theory was absurd, as it "repackaged Dr. Wiedrich's negligence *into his defense*." (Emphasis in original.) She says it is "simply not believable" that the defense experts would testify "that it is perfectly acceptable for a veteran, board-certified plastic surgeon to not appreciate the possibility that lumps can sometimes be cancer." She also takes issue with Dr. Wiedrich "bizarrely [choosing] to refer his adult patient to a pediatric geneticist who would not have let her in the door of his office." In her view, these two "failures," combined with what she calls "unrebutted" proximate-cause evidence, obligates a verdict in her favor and require us reverse the court's denial of JNOV.

¶ 35     We typically defer to a jury's credibility determinations. *Okic v. Fullerton Surgery Center Ltd.*, 2019 IL App (1st) 181074, ¶ 95; *Gapinski*, 2017 IL App (3d) 150502, ¶ 58. The jury was presented with competing evidence as to Dr. Wiedrich's alleged deviation from the standard of care. Rachel's experts opined that Dr. Wiedrich deviated from that standard by not appreciating the risk of cancer, ordering a biopsy, or referring her to a doctor who would have seen her. The defense experts, on the other hand, opined that, because Dr. Wiedrich did not have the knowledge to treat Rachel's condition, his obligation was to guide her to a doctor who did. In this case, he referred her to Dr. Charrow, a geneticist and expert in neurofibromatosis.

¶ 36    Viewing the evidence in the light most favorable to defendants, as we must on review, we find that the jury could have rationally found that Dr. Wiedrich did not deviate from the standard of care in referring Rachel to a doctor with more expertise on her condition. And though Rachel argues that the referral to Dr. Charrow was flawed, given that he did not treat adult patients, the defense countered that Rachel did not even try to see Dr. Charrow, who at a minimum would have been in a far better position than Dr. Wiedrich to recommend a treating physician for an adult like Rachel suffering from that condition. Even if Dr. Charrow would not have been the final stop in her search, he would have been a far better guide to that final destination.

¶ 37    We are not suggesting that Rachel's position on deviation from the standard of care lacked merit. We reiterate that we do not retry the case when determining the propriety of JNOV; instead, Rachel must clear the tall hurdle of showing that the evidence on this element so "overwhelmingly favor[ed]" Rachel that no verdict for the defense could ever stand. *Walton*, 388 Ill. App. 3d at 60. She is unable to meet that burden here.

¶ 38    We need not consider the evidence on the other elements. The jury returned a general verdict; if even one of the elements fails, the plaintiff fails to carry her burden of proof, and judgment for the defendant is appropriate. *Becker v. Alexian Brothers Medical Center*, 2021 IL App (1st) 200763, ¶ 13. Because the jury could have rationally found in favor of defendants on the issue of deviation from the standard of care, the trial court properly denied JNOV.

¶ 39                                    II. Publication of MyChart Entry to Jury

¶ 40    Rachel next argues that the court denied her a fair trial by refusing to allow publication of the MyChart entry discussed above.

¶ 41    A trial court has broad discretion to control the presentation of evidence; we will not overturn an evidentiary ruling absent an abuse of that discretion. *Sharbono v. Hilborn*, 2014 IL

App (3d) 120597, ¶ 29. An abuse of discretion occurs when no reasonable person would adopt the position of the trial court. *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 90. Significantly, even if we find error, a new trial is warranted only if the court's erroneous ruling resulted in prejudice, meaning the error impacted the outcome of the trial. *In re Marriage of Sadovsky*, 2019 IL App (3d) 180204, ¶ 24; *Lisowski v. MacNeal Memorial Hospital Association*, 381 Ill. App. 3d 275, 283 (2008).

¶ 42    As a reminder, the MyChart document was relevant to Rachel's claim that Dr. Wiedrich specifically told her that her tumor was not cancerous, thereby lulling her into a false sense of security about her health. The MyChart entry in question described Rachel's tumor as "benign," which of course is another way of saying non-cancerous—thus, in Rachel's view, supporting the notion that she was explicitly given a clean bill of health, so to speak.

¶ 43    Defendants raise several counterarguments, including that Dr. Wiedrich did not author that MyChart entry, and thus it was improper impeachment in the first place; that Rachel never authenticated or laid a sufficient foundation for this MyChart entry as a business record, much less introduced it into evidence; and that a trial court has the discretion to limit the publication of exhibits that were never admitted as evidence.

¶ 44    All of those points have merit. But we resolve this issue on another argument defendants make: any error in refusing to allow publication of the MyChart entry to the jury during closing argument was not prejudicial, given how often Rachel pressed the point to the jury despite the lack of a visual aid. We agree with defendants and thus need not decide whether the court committed error in denying publication of the MyChart entry to the jury. Even if error occurred (by no means are we saying it did), that error was not prejudicial—it would have had no impact on the jury's verdict. We reach that conclusion for more than one reason.

¶ 45    First, as defendants note, Rachel was able to impress this point repeatedly before the jury. The trial court allowed Rachel to impeach Dr. Wiedrich, who denied ever discussing cancer with her one way or the other, with this MyChart entry's reference to the word "benign." She questioned him multiple times in multiple ways about this entry. And in closing arguments, she returned to this point often. The point could not possibly have been lost on the jury.

¶ 46    And while we recognize that visual aids can sometimes carry a more substantial impact than the spoken word, as "people learn and understand better what they see *** than what they hear" (*Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 30), this case does not strike us as a particularly good illustration of that point. After all, it's not as if we are comparing the difference between verbally describing the ceiling of the Sistine Chapel versus seeing it up close. Nor are we considering a demonstrative exhibit that neatly summarized complex financial transactions into an easily understood chart. At issue here was merely a single word—the word "benign." It's nearly impossible to imagine that literally seeing the word "benign" on the MyChart entry, versus hearing the word emphasized orally multiple times, would have magically flipped the outcome of the case.

¶ 47    Because she cannot establish that any error in denying publication of the MyChart entry to the jury was prejudicial, Rachel cannot prevail on this claim of error, either. The trial court properly denied her motion for a new trial.

¶ 48                                   CONCLUSION

¶ 49    The judgment of the circuit court is affirmed.

¶ 50    Affirmed.