2019 IL App (2d) 180118
No. 2-18-0118
Order filed October 22, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| TONY AND ELZENA PUGH, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 13-L-928 |
| | ) | |
| ADVOCATE HEALTH AND HOSPITALS | ) | |
| CORPORATION d/b/a ADVOCATE GOOD | ) | |
| SHEPHERD HOSPITAL, MEDICAL GROUP | ) | |
| LAKE COOK ORTHOPEDIC ASSOCIATES, | ) | Honorable |
| and JACK PERLMUTTER, M.D., | ) | Margaret M. Mullen and |
| | ) | Michael J. Fusz, |
| Defendants-Appellees. | ) | Judges, Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Plaintiffs' posttrial motion failed to properly preserve with specificity their argument that the trial court erred by permitting undisclosed expert testimony in violation of Supreme Court Rule 213; the trial court's refusal to grant a jury instruction on *res ipsa locquitur* was not an abuse of discretion and because plaintiffs' summary judgment argument merged into the judgment regarding *res ipsa* entered at trial, the issue whether the trial court erred by not granting partial summary judgment on *res ipsa* is not reviewable on appeal; and, similar to their first issue, plaintiffs' posttrial motion failed to properly preserve with specificity their argument that they are entitled to a new trial based on defense counsel's conduct during questioning and closing argument.   Affirmed.

¶ 2    Plaintiffs, Tony and Elzena Pugh, brought a medical malpractice suit against defendants, Jack Perlmutter M.D., and Medical Group Lake Cook Orthopedic Associates (defendant Advocate Health and Hospitals Corporation d/b/a Advocate Good Shepherd Hospital was dismissed with prejudice pursuant to the terms of a settlement agreement with plaintiffs), alleging Perlmutter breached the standard of care he owed to Tony during spinal surgery. Tony underwent a spinal fusion and discectomy to lumbar regions L3-L4 and L4-L5 on September 28, 2012. It was undisputed that during this surgical procedure, Perlmutter misread a radiological film and performed a spinal fusion on L2-L3. Four days later, Tony underwent a second surgery. Plaintiffs alleged that Tony became incapacitated and claimed total disability from work. Elzena, Tony's wife, claimed that she sustained damages as a result of injuries suffered by Tony. Plaintiffs alleged *res ipsa locquitur* in count II of their first amended complaint.

¶ 3    After the jury returned a verdict for defendants, plaintiffs filed a posttrial motion, which was denied. On appeal, plaintiffs contend: (1) the trial court erred by permitting undisclosed expert testimony pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1 2007); (2) the trial court erred by not granting plaintiffs partial summary judgment on *res ipsa locquitur* and refusing their jury instruction on the same; and (3) they are entitled to a new trial based on defense counsel's conduct during questioning and closing argument. We affirm.

¶ 4                                    I. FACTS

¶ 5    At trial, plaintiffs presented the following witnesses: Dr. Stanley Gertzbein and Dr. Richard Jackson (plaintiffs' expert witnesses), Dr. Seng Leong (Tony's internist), Michael Blankenship, an expert vocational rehabilitation specialist who performed an assessment and found Tony disabled with an earning capacity impacted by his injuries related to the wrong site

surgery in the amount of $926,887, and defendant, Dr. Jack Perlmutter, as an adverse witness. Plaintiffs also called Tony, Elzena, and Roderick Stringwell (Tony's co-worker).

¶ 6    Defendants presented the following expert witnesses in support of their case:   Dr. Perlmutter and Dr. Terrance Lichtor, who both testified as to the standard of care; and Dr. Andrew Zelby, an expert on causation and damages.

¶ 7    The following relevant testimony was presented at trial.   Tony had significant back pain starting in the late 1990's.   Tony had abnormal lumbar anatomy or what was sometimes referred to as an anatomical variance or abnormality.   His lumbar spinous process curved downward, as opposed to going straight up.   Leong, his primary care physician, treated him for this condition. When the problem became more severe, Tony saw Perlmutter in 2003 for an assessment, who believed that Tony had serious issues with his spine, but was too young for surgery at that time. Perlmutter found that Tony had pathological changes in his back but recommended that he try conservative treatment.   Tony did this, but his pain continued until 2009.

¶ 8    In 2009, Tony returned to the spinal surgeon because of worsening pain, numbness, and disability.   He was evaluated by an orthopedic surgeon, Dr. Brebach, Perlmutter's colleague, who recommended surgery at that point.   However, Tony did not follow up on his recommendation.

¶ 9    In the spring of 2012, Tony injured his back while he was moving heavy furniture.   He visited Leong, who recommended therapy, which did not help.   Tony went to pain management and had an epidural steroid injection, which did not help either.   Tony had pain in his legs and his whole lower extremity.   He could not even lie down, stand erect, or bend over.   His gait was off, and he could not feel his feet.   He could not engage in any real activity.   Gertzbein stated that Tony had pain complaints of 8-9-10 from the left buttocks into the legs.   Tony had trouble walking any distance, even to the car.   He had trouble sitting for 30 minutes and could not stand.

Gertzbein agreed that Tony had failed conservative therapy and it was correct to offer a surgical option.

¶ 10    Leong referred Tony to Perlmutter.  He told Tony that spinal surgery with the fusion would take 1½ to 2 years to make him feel better.

¶ 11    Tony filled out a pain diagram for Perlmutter, which showed extensive pain.  Perlmutter testified that Tony's symptoms were consistent with cauda equina syndrome.  Tony had a flattened lordotic curve.  He had bones sliding off each other.  He had disease at the L5-S1 level and was in danger of further breakdown at that level.  There was no increased danger at that level if the operation was extended up to L2-L3.  There was no greater chance of breakdown at the L1-L2 level, with a 3 level fusion as opposed to a 2 level fusion.

¶ 12    Perlmutter performed the operation on September 28, 2012, when Tony was approximately 54 years' old.  Perlmutter placed a marker after he made the incision to identify the anatomy of the spine.  An x-ray was then taken.  Gertzbein testified that one could not see anything from the x-ray marker which could tell Perlmutter that he was at the wrong level of the spine.  When he operated at the wrong site, he found the pathology he expected to find.

¶ 13    Perlmutter ordered a CT scan when Tony expressed some symptomatology that he did not expect.  The scan revealed that the procedure took place from L2-L3 to L3-L4 when it had been planned to go from L3-4 to L4-L5.  Perlmutter planned a new operation to extend down to the L4-L5 space.

¶ 14    Perlmutter encountered a lot of scar tissue at the second operation, which took place four days later on October 2, 2012.  The dura was adhered and he encountered a dural tear. Gertzbein testified that, if Perlmutter had operated at the appropriate level the first time, there would have been a good chance of the dural tear.

¶ 15    When explaining the operation in detail, Perlmutter stated that when he got up to L2-L3, he found bulging discs, spinal stenosis, and some arthritis.   He did not put those in his operative report, as that is not his regular routine.   He further explained that he had a complication of the dural tear, but that would have occurred if he operated in that area in the first operation. Perlmutter stated that he complied with the standard of care and did not cause any injury or damages to Tony.

¶ 16    Lichtor explained that there are not any identifying features when a surgeon gets down to the anatomy and that there are not any identifying markers on the anatomy.   Exposing a disc space cannot tell a surgeon where the surgeon is.   Perlmutter exposed the disc space.   A surgeon would not see the sacrum when the surgeon is performing an operation at L4-L5.   The fluoroscopy picture taken intraoperatively looked okay as well.   One could only see that it was at the wrong level with restrospect after a CT scan.   Lichtor testified that wrong site surgery is something that happens when a surgeon performs these kinds of surgeries and that all physicians make mistakes.   The question is whether the mistake rises to the level that a reasonably well qualified physician would not do.

¶ 17    Lichtor testified that Perlmutter operated at two surgical sites—he did two correct levels and one incorrect level, and that there was a variety of reasons for it.   "The reasons are the body habitat; you know, not that [Tony] was super overweight but someone is a little heavy, it makes it harder to do.   There's [also] some anatomical variances in his spine, which might make it hard to do."   Lichtor further explained that the intraoperative fluoroscopy is of limited quality; it has a lower resolution than an x-ray.   All of these factors made it more difficult to be certain that one is at the right level.   Lichtor stated that the first procedure itself went without any complications other than the fact that the location was in the wrong site.   The second procedure

at the correct site did have complications, but Lichtor said the standard of care is what a reasonably well qualified spine surgeon would do under the circumstances and that Perlmutter made his best efforts to do that in both surgical procedures.

¶ 18    Lichtor confirmed that the x-ray would not have shown Perlmutter that he was at the wrong level.    The anatomic abnormality made it harder to interpret the film.

¶ 19    Lichtor did not testify that there was any significant pathology identified in Tony's spine at L2-L3.    His Rule 213 disclosure mentioned pathology at L2-L3 only regarding the treatment recommendation for the spinal fusion, not in support of any contention that the pathology at L2-L3 mimicked the pathology at L3-L4, such that Perlmutter reasonably believed that L2-L3 was L3-L4 contributing to his surgical mistake.    Lichtor stated that there were many cases where he was not sure that he was at the right level, which plaintiffs alleged was never properly disclosed in his deposition or Rule 213 disclosures as a basis for believing that Perlmutter operated consistent with the standard of care.

¶ 20    Gertzbein testified that Tony was always in pain.    He had years of pain going down into his legs and Gertzbein would not expect Tony to be free from pain after the planned surgery. Gerzbein stated that a dural tear is not an indication of negligence.

¶ 21    Tony returned to Leong after the surgery on October 25, 2012, and stated that he was doing much better.    There was no pain into his legs.    At a November visit, he still did not exhibit any pain into his legs.    In December, there was still further improvement.    In a pain diagram done in April 2013, Tony did not report pain going into the legs or into the toes, although he did have some pain.    Gertzbein testified that the process of healing can take up to two years.    Tony reported numerous other pains that were not related to the surgery.

¶ 22    Gertzbein explained that if there is a lot of chronic inflammation and scarring, arachnoiditis can develop even without surgery, so Tony was at risk because of his long term chronic inflammation.    Arachnoiditis is a medical term that simply means marked scarring in and around the nerves inside the spine and that kind of scarring can cause complications such as pain.    If there is an added component of calcific arachnoiditis, calcium forms in and around the scar.    That condition can happen in any operation without negligence.    He also stated that a dural tear can sometimes be associated with arachnoiditis.    Arachnoiditis does not happen quickly and usually occurs over many months.    In Tony's case, Gertzbein believed that it was identified after a CT scan in April 2016.

¶ 23    When Gertzbein examined Tony, he felt that the pain Tony experienced was attributable in part to the arachnoiditis.    Gertzbein thought there was some diminished sensation, but that could be consistent with pressure for 10 years.

¶ 24    At first, Gertzbein opined that Perlmutter deviated from the standard of care by not reoperating on Tony in November when an x-ray revealed the cage had migrated.    However, Perlmutter could not have done that because he was not treating Tony at the time.    A different spinal surgeon could have offered the operation.    Gertzbein then qualified that he was accusing Leong of negligence for failing to refer Tony to a spinal surgeon.    Gertzbein opined that, if it was revised at this time, in all medical probability the pain would have been significantly improved.    He then stated that Tony did not return to a surgeon as directed.

¶ 25    Gertzbein stated that by January 2013, Tony was able to touch his ankles and he was able to squat with 15 pounds in each hand.    Because he had very substantial improvement, Tony was discharged from therapy.    Tony had overall very substantial improvement through March 2013.

¶ 26    Gertzbein testified that he was not saying that no matter what, a wrong level surgery is a deviation from the standard of care.   It depended on the circumstances.   If a surgeon is reasonably careful and operated at the wrong level, that could be within the standard of care.   He believed that he could not see anything from the x-ray marker that would tell Perlmutter that he was at the wrong level.   Gertzbein admitted that there was no complication other than there was one wrong level at the first operation.    Gertzbein testified that he was not aware of any case in his 40 years of practice where a surgeon operated at the wrong surgical site of the lumbar spine, but it was not a breach of the standard of care.

¶ 27    Judge Mullen conducted the jury instruction conference.   As to the *res ipsa locquitur* instruction, the judge indicated that this was not the sort of action that could be explained without the assistance and guidance of expert testimony and that no expert testimony in this case supported the *res ipsa* claim.   After the court refused plaintiffs' instruction on the *res ipsa* count, plaintiffs' counsel stated that he had nothing further to add.

¶ 28    Following the trial and closing arguments, the jury returned a verdict for the defense.

¶ 29    Prior to the trial, defendants had filed a motion for partial summary judgment on the *res ipsa* count.   Plaintiffs then filed a counter-motion for partial summary judgment on the same issue.   The trial court denied the motions and set the matter for trial on all issues, including the *res ipsa* count.

¶ 30    After trial, plaintiffs filed an amended posttrial motion for judgment notwithstanding the verdict (JNOV).[1]   The court denied the motion for JNOV.   With regard to the verdict being against the manifest weight of the evidence for a new trial, the court found that there was evidence by Perlmutter that he was in compliance with the standard of care.   The court found

_____

[1] Judge Fusz ruled on the motion, as Judge Mullen had retired from the bench.

there was evidence that simply operating at a different level than intended does not equal professional negligence or a violation of the standard of care. The court found that this was not a case within the common knowledge of laymen and that this was not a case where there was any expert testimony that this kind of mistake only occurs where there is a violation of the standard of care. The court concluded that, giving the instruction on *res ipsa* would have required the jury to speculate and to conclude that a bad result equals bad conduct or negligence on the part of the doctor. To the extent that plaintiffs alleged other errors in the posttrial motion, the court denied those on the basis that there were no citations and no support.

¶ 31    Plaintiffs timely appeal.

¶ 32                                  II. ANALYSIS

¶ 33    Plaintiffs raise three main arguments for reversing the jury's verdict. They contend that the trial court erred by allowing defendants' opinion witnesses to give testimony in violation of Rule 213 and by not granting them partial summary judgment on *res ipsa locquitur* and refusing their jury instruction on the same. Plaintiffs also contend that they are entitled to a new trial based on defense counsel's conduct while questioning the witnesses and during closing argument.

¶ 34                              1. Rule 213 Violations

¶ 35    Plaintiffs first raise several specific claims that the trial court erred in allowing the expert testimony of defendants' opinion witnesses, Drs. Perlmutter, Lichtor, and Zelby, that was not properly disclosed under Rule 213(f). Plaintiffs claim that the trial court's abuse necessitates a new trial due to the numerous violations.

¶ 36   Defendants respond that plaintiffs' arguments should be rejected because plaintiffs forfeited these claims by failing to include them with specificity in their posttrial motion.   We agree.

¶ 37   Our review of the record as well as plaintiffs' posttrial motion leads us to conclude that they have failed to preserve these issues for appellate review by either failing to raise these issues in their posttrial motion or by failing to object during trial.   Section 2-1202(b) of the Code of Civil Procedure (Code) mandates that a posttrial motion contain the points relied upon, "particularly specifying the grounds in support thereof."   735 ILCS 5/2-1202(b) (West 2018). Our supreme court in *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344 (1980), outlined the threefold purpose of the posttrial motion specificity rule:   (1) they allow the trial court, which is most familiar with the trial, to review its decisions "without the pressure of an ongoing trial[;]" (2) they allow a reviewing court to ascertain from the record whether the trial court has been afforded an opportunity to reassess its ruling in question; and (3) they "prevent[ ] [litigants] from stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider."   *Id.*, 83 Ill. 2d at 349-50.   Furthermore, Supreme Court Rule 366(b)(2)(iii) (eff. Feb. 1, 1994) provides, "A party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion."

¶ 38   Here, plaintiffs made only general allegations of error in their posttrial motion stating: "The court improperly allowed the defense to admit certain evidence that was not related to the previous opinions regarding the standard of care, proximate cause and of Tony Pugh's injuries, in breach of Rule 213, depriving Plaintiffs of a fair trial."   In fact, the trial court commented that it did not know what plaintiffs referred to.   We find that this issue is nothing more than a

nonspecific, general objection that was not properly presented to the trial court, and thus, plaintiffs' issues are forfeited.

¶ 39    Plaintiffs respond that defendants inaccurately cite *Gorski v. Board of Fire and Police Commissioners of Woodstock*, 2011 IL App (2d) 100808, to support their argument.    Plaintiffs are correct, as that case relates to appellate briefing, not posttrial motions.    Nevertheless, plaintiffs ignore Rule 366(b)(2)(iii) as well as our supreme court's analysis in *Brown.*

¶ 40    Even if we were to address plaintiffs' specific claims of Rule 213 violations, we would not say that it affected the outcome of the trial so as to require reversal and a new trial.    The decision whether to allow an expert to present certain opinions is within the trial court's discretion and will not be disturbed absent an abuse of discretion.    *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009).    An abuse of discretion will be found only if no reasonable person would take the view adopted by the trial court.    *Id.*, 393 Ill. App. 3d at 812.

¶ 41    "Rule 213 is mandatory and strict compliance is required."    *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 938 (2000).    Compliance with Rule 213 requires not only the disclosure of the specific opinion of the expert witness but the basis for that opinion as well. *Id.*, 316 Ill. App. 3d at 941.    Reversal is proper where a Rule 213 violation affects the outcome of a trial.    See *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 382 (2004) (erroneous admission of an undisclosed expert opinion and the trial court's failure to apply the proper remedy to the Rule 213 violation warranted reversal and a new trial).

¶ 42    In this case, plaintiffs failed to object to either Lichtor's or Perlmutter's testimony regarding L2-L3 pathology**.**    See *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 206 (1992) (moving party must contemporaneously object when evidence is offered or the objection will be waived).

¶ 43    The trial court further sustained plaintiffs' counsel's objection to Lichtor's testimony that there was literature to support wrong-site surgery being a known surgical complication and admonished the jury to disregard it.    Lichtor also twice did refer briefly to studies of wrong-level spine surgery, but each time, the court sustained the objections.    Sustaining an objection cures any prejudicial impact from the testimony.    *Gapinski v. Gujarati*, 2017 IL App (3d) 150502, ¶ 54

¶ 44    As to Zelby's testimony, we find no Rule 213 violation occurred.    Zelby, defense's expert witness on causation and damages, was retained to testify about Tony's condition before and after surgery.    During his direct testimony, he was asked about the disease process in Tony's spine prior to the surgery.    Plaintiffs' counsel objected, stating that this testimony was an undisclosed opinion on the standard of care.    The judge overruled the objection, finding that Zelby had been disclosed as a causation witness, "so therefore, I assume that, yes, he's going to testify concerning plaintiff's condition."    The judge noted that testimony relating to this issue had been disclosed.

¶ 45    Plaintiffs argue on appeal that this testimony about disease process was objectionable because it "had no other purpose than to present before the jury that there was significant pathology at L2 that would be reinforced by the testimony of Perlmutter and Lichtor that the pathology at L2-L3 justified Perlmutter's erroneous belief that he operated at the proper lumbar level at the time of Plaintiffs' initial surgery."    However, the record does not show the opinion that pathology at L2-L3 justified surgery at those levels was ever offered, nor do plaintiffs cite where in the record that Zelby gave this opinion.

¶ 46    A party is not entitled to reversal based upon the trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case.

*Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 847-48 (2010). If the trial was fair as a whole and the evidence was sufficient to support the jury's verdict, a case will not be reversed upon review. *First National Bank of La Grange v. Glen Oaks Hospital and Medical Center*, 357 Ill. App. 3d 828, 833 (2005). Upon our review of the record, we could not find any evidentiary decisions where objections were preserved that would rise to the standard for reversible error.

¶ 47                                    2. *Res Ipsa Locquitur*

¶ 48    Plaintiffs contend that the trial court abused its discretion in not granting them partial summary judgment on *res ipsa locquitur* and refusing to give Illinois Pattern Jury Instructions, Civil, Nos. 105.09, 105.01, and 22.01 (3d ed. 1995) for the jury to consider the facts presented from the trial under the same. We will address plaintiffs' jury instruction argument first.

¶ 49    Each party has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). To justify an instruction, some evidence in the record must support the theory. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 549 (2008). It is within the circuit court's discretion to determine what issues are raised by the evidence and whether an instruction should be given. *Id.* The test for determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions in their entirety. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995).

¶ 50    Section 2-1113 of the Code provides:

        "In all cases of alleged medical or dental malpractice, where the plaintiff relies
        upon the doctrine of *res ipsa locquitur*, the court shall determine whether that doctrine
        applies. In making that determination, the court shall rely upon either the common

knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine." 735 ILCS 5/2-1113 (West 2018).

¶ 51 *Res ipsa locquitur* is a method to prove a defendant's negligence in the limited circumstance where direct evidence of negligence is unavailable. To prevail on *res ipsa locquitur*, the plaintiff must establish that (1) the occurrence is one that ordinarily would not happen in the absence of negligence and (2) the defendant had exclusive control of the instrumentality that caused the event. *Dyback v. Weber*, 114 Ill. 2d 232, 242 (1986). The requirement that the occurrence would not ordinarily happen in the absence of negligence must be established by expert medical testimony, unless the court finds that the alleged negligence was so "grossly apparent" that common knowledge of the layperson is adequate to make that determination. *Piquette v. Midtown Anesthesia Associates*, 192 Ill. App. 3d 219, 223 (1989).

¶ 52 In this case, there was a dispute regarding whether defendant complied with the standard of care. Plaintiffs' own expert, Gertzbein, and defendants' experts agreed that not all wrong-level spine surgery violates the standard of care. We note that Jackson never addressed whether defendant complied with the standard of care. Thus, identifying the correct level for spine surgery is something that is outside the common knowledge of a layperson and the expert testimony did not support the *res ipsa* theory. Thus, we find that the trial court's refusing the jury instruction was not an abuse of discretion.

¶ 53 Regarding plaintiffs' summary judgment argument, generally, "when a motion for summary judgment is denied and the case proceeds to trial, the denial of summary judgment is

not reviewable on appeal because the result of any error is merged into the judgment entered at trial. [Citations.] The rationale for this rule is that review of the denial order would be unjust to the prevailing party, who obtained a judgment after more complete presentation of the evidence." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 355-56 (2002).

¶ 54 The issue presented both at summary judgment prior to trial and at trial was whether plaintiffs factually supported their *res ipsa locquitur* theory with expert medical testimony. As we held above, plaintiffs failed to meet this requirement. Accordingly, plaintiffs' summary judgment argument merged into the judgment entered at trial and is therefore not reviewable on appeal.

¶ 55 There is an exception to the rule that the denial of summary judgment is not reviewable on appeal where the issue raised in the summary judgment motion is a question of law that would not be decided by the jury. *Wheeler Financial Inc. v. Law Bulletin Publishing Company*, 2018 IL App (1st) 171495, ¶ 67 (citing *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42). Even if we were to review this under the exception, the result would be the same. The layperson exception to medical expert testimony does not apply and the expert testimony did not support the *res ipsa locquitur* claim.

¶ 56                                     3. Defense Attorney Conduct

¶ 57 Plaintiffs finally contend that they are entitled to a new trial based on defense counsel's conduct in questioning witnesses and during closing argument. Similar to plaintiffs' first issue, plaintiffs' posttrial motion does not raise these issues with specificity. The trial court rejected these arguments because they were so cursory that the court could not comprehend them, and therefore, the trial court did not have the opportunity to comment on or correct the complained of

errors. Because plaintiffs failed to adequately raise this issue in their posttrial motion, their argument on appeal is forfeited. See *Webber v. Wight & Company*, 368 Ill. App. 3d 1007, 1018 (2006) (citing *Brown*, 83 Ill. 2d at 53).

¶ 58 Forfeiture aside, upon our review, all of the specified improprieties, except for one, were objected to, the objections were sustained, and the jury was admonished to disregard them. We presume that the jury followed these instructions. Sustaining an objection and instructing the jury to disregard the stricken testimony cures any potential prejudice and absent clear evidence to the contrary it is presumed that the jury followed the instruction. *Garcia v. City of Chicago*, 229 Ill. App. 3d 315, 321 (1992).

¶ 59 The one issue where there was no objection concerned plaintiffs' damages expert, Michael Blankenship. Blankenship is a vocational rehabilitation consultant, who works almost exclusively calculating damages in personal injury actions. Although plaintiffs requested that we review this as plain error, this argument is totally undeveloped.

¶ 60 Plaintiffs argue that defense counsel questioned Blankenship suggesting that there was an improper relationship between the witness and plaintiffs' counsel. Blankenship wrote an article entitled "How to Maximize or Minimize Personal Injury Damages" for the Journal of the Indiana Trial Lawyers Association.

¶ 61 Plaintiffs complain about the following questions to Blankenship:

"Q. [Y]ou also have an article in there that we talked about, and it's called—I'm going to try and quote this correctly.

A. Okay.

Q. Just so I have a clean question, am I stating the title correctly: 'How to Maximize or Minimize Personal Injury Damages'?

> A.    That's correct.
>
> Q.    And you said well, one way to maximize is to look at the database you have, and if you're on the plaintiff's side, the plaintiff provides or presents themselves for an upgraded, updated and comprehensive evaluation, and if it shows a greater severity or a greater limitation, that's one of the ways to maximize the outcome for the plaintiff. That's what you told me, correct?
>
> A.    And I agree with that, sure.   I stand by that.
>
> Q.    So that's what we have in this case, isn't it?   We have records of medical treaters who weren't saying he couldn't work, so they sent him to you and to Dr. Jackson to get this report that he's restricted.   They followed your article, didn't they?
>
> A.    (No response)."

At that point, plaintiffs' counsel objected, the objection was sustained.   Then in the presence of the jury, the trial court ordered the question stricken and instructed the jury to disregard it.

¶ 62    Counsel for the defense then reframed the question and examined Blankenship on his report and the examination of Jackson, without objection from plaintiffs.   Plaintiffs suggest that this question somehow inherently tainted the trial.   However, the facts came from the evidence and it appears that this was proper comment on Blankenship's credibility.

¶ 63    Plaintiffs claim that defense counsel's conduct cumulatively warrants a new trial. However, plaintiffs never moved for a mistrial even though the trial court gave them the opportunity to do so then.   During the sidebar out of the presence of the jury, the court chastised defendants' counsel, stating "[s]hame on you," for improperly questioning the witness to "make it seem like Plaintiffs' attorneys *** are engaged in some kind of a conspiracy all without evidence."   When plaintiffs' counsel stated that "ordinarily this would be cause for a mistrial,"

the court stated that, when the witness leaves the stand, they could make "any motions" plaintiffs wished. When errors cumulatively are "so prejudicial" to the outcome of a trial, a new trial is the proper remedy. *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶127. In other words, where the errors together deprive a party of a fair trial such "that the verdict might have been affected," a new trial is warranted. *In re Estate of Mankowski*, 2014 IL App (2d) 140154, ¶ 63. Here, if plaintiffs' had thought defendants' counsel's examination was so objectionable they could have moved for a mistrial at the time but did not. Moreover, while plaintiffs argued in their amended posttrial motion "for judgment notwithstanding the verdict or for a new trial" that the court erred in not declaring a mistrial, they failed to raise the argument with any specificity and they failed to note that they did not seek a mistrial at the time.

¶ 64                                    III. CONCLUSION

¶ 65    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 66    Affirmed.